

04/17/2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| VENUS EXPLORATION, INC. | § | Case No. 02-13109 |
| | § | |
| | § | |
| Debtor | § | Chapter 11 |

| | | |
|---|---|---|
| TRAIL MOUNTAIN, INC. | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Adversary No. 06-1027 |
| | § | |
| PYR ENERGY, INC. and | § | |
| SAMSON LONE STAR | § | |
| LIMITED PARTNERSHIP | § | |
| | § | |
| Defendants | § | |

## MEMORANDUM OF DECISION[1]

On this date the Court considered the Motion for Partial Summary Judgment

("Motion") filed by Trail Mountain, Inc. ("Trail Mountain"), the Plaintiff in the above-

referenced adversary proceeding, the Motion for Partial Summary Judgment filed by Co-

Defendant, Samson Lone Star Limited Partnership ("Samson"), and the Cross-Motion for

Summary Judgment and Brief in Support filed by Co-Defendant, PYR Energy, Inc.

("PYR"), along with all pleadings in support and opposition thereto.  Trail Mountain

seeks summary judgment on its claim for a declaratory judgment that the 2002 Joint

---

[1] This Memorandum of Decision is not designated for publication and shall not be considered as
precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case
or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

Operating Agreement and the area of mutual interest created thereby are effective and

enforceable as to both Defendants, PYR and Samson.  Samson supports the declaratory

relief sought by Trail Mountain and, in its own motion for partial summary judgment,

seeks a declaration that the 2002 Joint Operating Agreement was not rejected by the terms

of the confirmed Chapter 11 plan of reorganization of Venus Exploration, Inc. ("Venus").

In opposition thereto, PYR seeks by its motion for summary judgment a declaration that

the 2002 Joint Operating Agreement was not assumed by Venus, nor assigned to PYR,

and that PYR is not bound thereby.  Additionally, based on its desired declaration of the

inapplicability of the 2002 Joint Operating Agreement, PYR seeks dismissal of Trail

Mountain's claims for reformation of that contract, breach of that contract, and attorney's

fees.

## Factual Background

On October 9, 2002 (the "Petition Date"), Pioneer Drilling, Baker Hughes and

Knight Oil Tools commenced an involuntary bankruptcy proceeding against Venus.  Prior

to the Petition Date, Venus and Trail Mountain had entered into a Joint Operating

Agreement dated March 1, 2002 (the "2002 JOA") with respect to the exploration and

development of certain oil and gas properties within an area known as the Nome Prospect

in Jefferson County, Texas ("Nome Prospect" or "Nome Field").  The parties agree that

the 2002 JOA constituted an executory contract at the time the order of relief was entered

in Venus' Chapter 11 bankruptcy case.  The 2002 JOA included a provision mandating

that, if either party acquired additional mineral leases within a specified "area of mutual interest" (the "AMI"), such party was compelled to offer to the other a proportionate share of the interest in such leases. The 2002 JOA further provided that the contractual provisions creating the AMI and the obligations derived therefrom would be construed as covenants that run with the land with respect to the oil and gas leases and mineral interests subject to the JOA. The AMI provision also provided that the AMI "shall exist for as long as the leases subject to this agreement, or any future leases acquired by the parties subject to this Operating Agreement with the AMI, are in force and effect." [2]

In 2003, Venus negotiated a sale of its interest in certain properties within the Nome Prospect to Samson. After its initial attempt to gain approval of this sale through an expedited process was rejected by the Court, Venus subsequently filed on July 11, 2003, a "Second Motion to Sell Property (Nome Field) Free and Clear of Liens and Interests Pursuant to 11 U.S.C. §363(f)" (the "Samson Sale Motion"). Trail Mountain was served with a copy of the Samson Sale Motion and its attached exhibits. Among the exhibits attached to the Samson Sale Motion was the Purchase and Sale Agreement between Venus and Samson (the "Samson PSA"), prepared and executed in letter format and dated June 12, 2003. Objections to the Samson Sale Motion, as supplemented,[3] were filed by the Official Committee of Unsecured Creditors and by Range Production I, L.P.

---

[2] *See* Exhibit 1 of Trail Mountain's Corrected Appendix in Support of Motion for Partial Summary Judgment, Art XV, ¶ N., p. 26.

[3] The Samson Sale Motion was subsequently supplemented on July 25, 2003 (dkt #277).

On August 21, 2003, upon resolution of the pending objections, the Court entered an

order authorizing Venus, as a debtor-in-possession, to sell the designated interests in the

Nome Field to Samson free and clear of liens pursuant to the terms and conditions of the

Samson PSA.  The Samson PSA incorporated a model form operating agreement (the

"Samson JOA") dated May 27, 2003, and provided that the transferred properties would

be operated in accordance with the new Samson PSA and the Samson JOA.

In this sale to Samson, Venus retained certain properties which it owned within the

Nome Prospect – properties which are now collectively referenced as the Cotton Creek

Prospect ("Cotton Creek").[4]  While the parties may dispute the clarity with which the

Samson Sale Motion identified any portion of the Nome Field which would be withheld

from the sale to Samson, there is no summary judgment evidence, nor even any

allegation, that the legal descriptions of the leases to be transferred did not accurately

represent the intentions of Venus to withhold, and of Samson to forego, the acquisition of

the Cotton Creek acreage.  On October 13, 2003, Trail Mountain and Samson executed a

model form operating agreement (the "2003 JOA") that was substantially similar to the

Samson JOA.[5]  It is uncontested that Venus filed no formal motion to assume and assign

---

[4]  The 2002 JOA appears to prohibit a partial sale of either party's interest in the Nome Field.
However, any failure by Venus to honor that contractual provision was a breach by Venus only and
cannot be the genesis of contractual liability on the part of Samson (the initial purchaser) or any
subsequent purchaser.

[5]  Trail Mountain contests the characterization of these operating agreements as similar, but the
Court concludes that the documents, and their similarity, speak for themselves.

executory contracts in connection with the sale to Samson.[6]

After closing the sale to Samson, Venus subsequently negotiated a sale of its remaining assets to PYR. This sale included Venus' reserved interest in the Nome Prospect[7] and its interests in the Cotton Creek Prospect. Venus and PYR executed a Purchase and Sale Agreement (the "PYR PSA") reflecting their agreement. On February 10, 2004, in conjunction with the filing of its proposed Chapter 11 plan of reorganization and its accompanying Disclosure Statement, Venus filed its "Motion to Sell Substantially All Property of the Debtor Free and Clear of Liens and Interests Pursuant to 11 U.S.C. §363(f) and Assumption and Assignment of Executory Contracts Under 11 U.S.C. §365" (the "PYR Sale Motion"), seeking, among other relief, approval of the sale of the specified assets to PYR.[8] A copy of the PYR PSA was attached to the PYR Sale Motion. One week later, in response to the Court's order striking the portion of the PYR Sale Motion which pertained to the assumption and assignment of executory contracts "without prejudice to the Debtor's right to file an independent motion for such relief

---

[6] A list of contracts was attached to the Samson PSA. However, notwithstanding speculations regarding the effect of this list, the list did not constitute a formal motion to assume and assign. If Samson chose to honor the terms of the listed contracts, it did so on its own prerogative and not because it was compelled to do so under an assumption and assignment of those contracts effectuated pursuant to the Bankruptcy Code.

[7] In conjunction with the Samson sale, Venus retained an overriding royalty interest in all the properties transferred to Samson. Thus, after the Samson sale, Venus continued to have royalty interests in the Nome field beyond its more substantive interests in the Cotton Creek acreage.

[8] The PYR Sale Motion was also accompanied by a motion for approval of certain procedures which essentially recognized PYR as a stalking horse in a process which would open the sale of the specified assets to competitive bidding and which sought to coordinate the sales process to the plan confirmation process.

which specifically identifies the contracts to be addressed and the parties which are affected thereby,"[9] Venus filed a motion to assume and assign certain executory contracts in connection with the sale to PYR, attached to which was an "Exhibit A" which, in conformity with the Court's order, specifically listed the executory contracts and/or leases which Venus sought to assume and to assign to PYR. Trail Mountain (along with Range Production I, L.P. and the Unsecured Creditors' Committee) objected to the PYR Sale Motion and the assumption motion.

On April 2, 2004, the Court conducted a hearing regarding the approval of the PYR Sale Motion and the accompanying motion for assumption of executory contracts/leases.[10] Both Trail Mountain and Range cross-examined Venus' representative regarding the assumption and assignment by PYR of operating agreements pertaining to certain properties in Evangeline Parish, Louisiana. After post-hearing clarifications were made regarding the Louisiana executory contract issues, the Court entered on April 9, 2004, agreed orders approving the sale (the "PYR Sale Order") and the assumption and assignment to PYR of the executory contracts/leases listed on "Exhibit A" of the

---

[9] See *Order Granting in Part and Denying in Part Debtor's Request for Expedited Hearing to Consider Motion for Approval of Procedure for the Sale of Substantially All of the Assets of the Debtor and For Related Relief* entered on February 13, 2004 (dkt #410) at p.2, which not only enforced the prohibition imposed by LBR 9004(c), but also expressly denied Venus' request to expedite the confirmation process. This hypersensitivity to form and process, which had been reflected earlier in the Court's denial of the first motion by Venus to sell the Nome Field properties to Samson in June, 2003, arose from a myriad of problems which had been engendered earlier in the case arising from the uncontested sale of Venus' interests in the Constitution Field to Samson in a highly-expedited fashion.

[10] The transcript of that April 2, 2004 hearing was filed in the Venus case as dkt #729.

assumption motion.

In the months following their respective purchases from Venus, both PYR and Samson have acquired and successfully developed additional properties which are located within the defined geographic sphere which constituted the AMI under the 2002 JOA between Trail Mountain and Venus. Samson has assigned to Trail Mountain a 50% interest in the properties it has acquired within that sphere.[11] PYR has made no such assignments to Trail Mountain on its acquisitions or developments in that sphere.

As a result of demands issued by Trail Mountain pertaining to certain successful projects which PYR had developed, on February 15, 2006, PYR filed its "Motion for Interpretation and Enforcement of §363 Sale Order" in Venus' main bankruptcy case which is presently before the Court and in which it asserts that the 2002 JOA between Trail Mountain and Venus is not effective as to PYR and that it has no obligation to Trail Mountain under the 2002 JOA or the AMI clause contained therein. Trail Mountain and Samson responded to that enforcement motion, with Trail Mountain seeking affirmative declaratory relief in its response.[12] A hearing was commenced on PYR's enforcement motion in April 2006, but was continued in mid-hearing to allow certain discovery to be taken and to allow the parties to address the concern that some of the relief sought by the

---

[11] Samson apparently did so pursuant to another AMI provision contained in the 2003 JOA arising from its Nome Field acquisitions from Venus.

[12] Charles Bearden, who served at that time as the trustee of the Venus Exploration Trust which had been created as a result of Venus' confirmed Chapter 11 plan, also filed an objection but, as stated by his counsel at the hearing, Bearden subsequently determined that the interests of the Trust had minimal effect upon the Trust's interests and the Trust only nominally participated in the hearing.

parties could only be obtained through the prosecution of an adversary proceeding.[13]

During the above-described hiatus, Trail Mountain instituted this adversary proceeding against PYR and Samson.  In its Complaint, Trail Mountain seeks:  (i) a declaratory judgment finding that the 2002 JOA and AMI Provision are effective and enforceable as to both Samson and PYR; (ii) reformation, as necessary, of Trail Mountain's obligations under the 2002 JOA; (iii) specific performance of the 2002 JOA requiring PYR to offer to Trail Mountain 50% of all after-acquired leases and interests within the AMI; and (iv) recovery of attorneys' fees and costs.[14]  The parties thereafter filed the respective motions for summary judgment presently before the Court.

## Discussion

*Standards for Summary Judgment*

Each party brings its respective motion for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056.  That rule incorporates Federal Rule of Civil Procedure 56 which provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[13]  The Court subsequently issued a scheduling order in the contested matter.

[14] Following the filing of Trail Mountain's complaint, PYR's motion was consolidated for hearing purposes with the adversary proceeding.  See *Order Regarding Prosecution of Motion for Interpretation and Enforcement of §363 Sale Filed by PYR Energy, Inc.* entered in the main bankruptcy case on June 5, 2006 (dkt #753).

-8-

moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

"Summary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). "The

inquiry to be performed is the threshold inquiry of determining whether there is the need

for a trial — whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505,

2511, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment always bears the initial responsibility of

informing the court of the basis for its motion, identifying those portions of the

"pleadings, depositions, answers to interrogatories, and affidavits, if any," which it

believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

323, 106 S.Ct. at 2553.[15] Only once the moving party has met this burden does the non-

moving party assume the burden of showing that a genuine issue of material fact exists.

*Gillory v. PPG Indus., Inc.*, 434 F.3d 303, 309 (5th Cir. 2005) (*citing Catrett*, 477 U.S. at

321-25, 106 S.Ct. at 2548).

---

[15] There can be no genuine issue of material fact as to the filing date and contents of documents actually filed with the Court. The Court is free to take judicial notice of such evidence in determining the merits of a motion for summary judgment. *See* FED. R. EVID. 201(b) and (f).

The manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial.  If the burden of persuasion at trial must be borne by the non-moving party, the party moving for summary judgment may satisfy the burden of production under Rule 56 by either submitting affirmative evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim. See 10A WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3d  §2727 at pp. 471-72 (1998).  *See also, Brewer v. Quaker State Oil Ref. Corp*., 72 F.3d 326, 329-30 (3d Cir. 1995); *Cannon v. Cherry Hill Toyota, Inc.*, 161 F. Supp.2d 362, 366 (D.N.J. 2001).

Once the motion is supported by a *prima facie* showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, but rather must demonstrate in specific responsive pleadings the existence of specific facts constituting a genuine issue of material fact for which a trial is necessary.  *Anderson,* 477 U.S. at 248-49, 106 S.Ct. at 2510 (*citing* FED. R. CIV. P. 56(e)).  The substantive law will identify which facts are material.  *Id.*

Thus, if a non-movant fails to set forth specific facts that present a triable issue, its claims should not survive summary judgment.  *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 494 (5th Cir. 2001).  As the Supreme Court has stated,

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which that
> party will bear the burden of proof at trial. In such a situation, there can be
> "no genuine issue as to any material fact," since a complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily
> renders all other facts immaterial. The moving party is "entitled to a
> judgment as a matter of law" because the nonmoving party has failed to
> make a sufficient showing on an essential element of her case with respect
> to which she has the burden of proof.

*Celotex*, 477 U.S. at 322-23, 106 S.Ct. at 2552.  Thus, "in the absence of the necessary

minimal showing by the plaintiff that the defendant may be liable under the claims

alleged, the defendant should not be required to undergo the considerable expense of

preparing for and participating in a trial." *Robinson v. Cutchin*, 140 F.Supp.2d 488, 491

(D. Md. 2001) (*citing Catrett*, 477 U.S. at 323-24, 106 S.Ct. at 2548 *and Anderson*, 477

U.S. at 256-57, 106 S.Ct. at 2505); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076

(5th Cir. 1994) ["A plaintiff should not be required to wait indefinitely for a trial when

the defendant has a meritless defense that can be resolved on motion for summary

judgment. Nor should a defendant be required to bear the unnecessary costs of delay and

trial to defend against a claim that has no merit. Neither party should be required to bear

the costs of trying all of the issues in a case when some can and should be resolved on

summary judgment."].

To determine whether summary judgment is appropriate, the record presented is

**-11-**

reviewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, if the evidence demonstrating the need for trial "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2511. Thus, a non-movant must show more than a "mere disagreement" between the parties, *Calpetco 1981 v. Marshall Explor. Inc.*, 989 F.2d 1408, 1413 (5th Cir. 1993), or that there is merely "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. However, "[t]he issue of material fact which must be present in order to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49, 106 S.Ct. at 2510. Accordingly, the process has been described by the Supreme Court as one which mandates the entry of summary judgment where the evidence is such that it would require a directed verdict for the moving party. "In essence, . . the inquiry. . . is. . : whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S.Ct. at 2512; *see also Harken Explor. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466 (5th Cir. 2001).

*Analysis*

There is one basic question at the heart of all the issues raised by the parties:  Is PYR bound by the 2002 JOA?  Trail Mountain advances several theories as to why PYR should be bound by that agreement.   Samson's contentions are related to, but slightly different than, those asserted by Trail Mountain.  The Court will address Trail Mountain's contentions in seriatim, touching on Samson's assertions in context.

Trail Mountain first contends that PYR is bound solely because it stands as the successor in interest to Venus as to the ownership of the Cotton Creek Prospect. However, the Bankruptcy Code clearly authorizes sales of a debtor's assets free and clear of interests in such property held by other parties.  Section 363(f) of the Bankruptcy Code provides that a debtor "may sell property ... free and clear of any interest in such property of an entity other than the estate ... if such entity consents."  The record is clear that Trail Mountain consented to the sale of Venus' assets to PYR.  Hence, the simple fact that PYR acquired assets from Venus does not bind PYR to all the obligations once associated with those assets.

Trail Mountain next contends that PYR contractually agreed to be bound by the 2002 JOA.  Because many documents were necessarily executed in order to accomplish the transfer of assets from Venus to PYR, the Court must consider the cumulative effect of these various documents, including the PYR PSA, the orders authorizing both the sale of Venus assets to PYR, the assumption and assignment of various lease agreements, and

-13-

the bills of sale and other documents executed by the parties after obtaining court approval of the transaction.  As Trail Mountain has cogently noted, several instruments comprising a single transaction must be construed together.  *Sunwest Operating Co. v. Classic Oil & Gas, Inc.*, 303 F.Supp.2d 827, 831 (E.D. Tex. 2004).  Furthermore, when construing contracts, courts must harmonize all clauses, even those that appear contradictory, in order to give each clause meaning.  *Id.*

Trail Mountain points to language in the PYR PSA, as well as in the related bill of sale, that could be construed to transfer Venus' assets to PYR subject to all existing contractual agreements related to such assets.[16]  However, such a construction would render meaningless two different, more detailed portions of the sale documents, namely sections 3.2 and 3.3 of the PYR PSA, as well as the entire set of documents related to Venus' Motion for Assumption and Assignment of Executory Contracts filed on February 17, 2004.

Sections 3.2 and 3.3 of the PYR PSA provide:

3.2    <u>Non-Assumption of Liabilities</u>: Unless Buyer specifically elects to do so, Buyer shall not assume or become obligated for the following:

(a)    Any unrecorded obligation,[17] commitment, debt, lien, or liability, not disclosed by Seller as required by Sections 4.1 and 4.2, below, on or after the closing date; . . .

---

[16]  For example, the PYR PSA provides that the properties to be acquired by PYR include "all existing and effective... operating agreements...."

[17]  Trail Mountain concedes that the 2002 JOA is not a recorded obligation.

(c)  Any claim, as that term is defined in the Bankruptcy Code,[18]

arising from the rejection of any lease or executory contract; or

(d)  Any and all claims, as that term is defined in the Bankruptcy Code, against the Bankruptcy Estate, whether known or unknown, allowed or disallowed, asserted or unasserted, except as is otherwise provided herein.

3.3    <u>Assumption and Rejection of Leases and Executory Contracts</u>: Within ten (10) days of the hearing on Seller's plan of reorganization or motion to approve bid procedures and sell the Properties to Buyer, Seller shall provide to Buyer a list of all leases and executory contracts to which it is a party (which shall be in addition to the oil and gas leases identified in Exhibit A hereto), along with a statement of the amount necessary to cure any existing default under any lease or executory contract.  Buyer shall inform Seller of which such leases and/or executory contracts it desires to assume, and Seller shall submit such list of leases and executory contracts to be assumed to the Bankruptcy court and all parties entitled to notice thereof, and shall otherwise seek approval of the assumption of any and all leases and/or executory contracts that Buyer so desires.[19]

---

[18]  The Bankruptcy Code's definition of claim includes "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C. §101(5).

[19]  *See* Exhibit 6 to Trail Mountain's Corrected Appendix in Support of Motion for Partial Summary Judgment.

Clearly the parties anticipated a procedure whereby PYR would specifically identify the contracts to which it was willing to be bound, thereafter providing notice to all affected parties, and then taking the designated assets subject only to those contracts it had so identified.  Additionally, the very purpose of Venus' Motion for Assumption and Assignment of Executory Contracts was to define specifically the universe of obligations to which PYR would be bound as a result of the sale process.  The entire assumption process would be rendered meaningless if PYR were found to be bound by an operating agreement which it specifically omitted from that process, with appropriate notice to affected parties.

Secondly, in recognition of the principles of proper contract interpretation, any contractual provision which generically states that PYR would be bound by all existing and effective operating agreements constitutes only a general provision which is subject to, and limited by, the more specific provisions in that same contract which delineate a finite set of operating agreements to which PYR would be bound — i.e., those specifically identified and actually assumed and assigned in Venus' Motion for Assumption and Assignment.[20]  *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133-

---

[20]  The Venus plan of reorganization contained a provision that all executory contracts not specifically assumed were rejected by the plan.  Trail Mountain suggests, in a theory more fully embraced by Samson, that the Venus plan of reorganization, approved in 2004, could not reject the 2002 JOA because Venus had allegedly assumed the 2002 JOA in connection with the Samson sale in the summer of 2003.  It is undisputed that no assumption motion was ever filed in connection with the Samson sale.  If Samson believed that the inclusion of the 2002 JOA on a list of contracts related to the properties it received under the Samson PSA was sufficient to effectuate an assumption and assignment of such contracts, then it was, and is, free to abide by such contracts, should it so choose.  But such a voluntary agreement on the part of either Samson or Trail Mountain cannot impose a similar obligation

34 (Tex. 1994); *SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's, London,* 179 S.W.3d 619, 627 (Tex. App.- Houston [1st Dist.] 2005, pet. denied); *C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768, 782 (Tex. App. - Houston [1st Dist.] 2004, no pet.) [all recognizing the well-established maxim that when there is a conflict between two contractual provisions, the specific provision controls over the general provision].

Trail Mountain also contends that PYR should be bound by the AMI provision contained in the 2002 JOA because that provision constitutes a covenant running with the land.  Regardless of whether the provision constitutes a covenant running with the land, which is a question of state law, the relevant inquiry for the Court is whether the AMI provision is part of an executory contract which is subject to assumption or rejection by a debtor-in-possession — which is a question of federal law.  *Steffan v. McMillan (In re Coordinated Fin. Planning Corp.)*, 65 B.R. 711, 712-13 (B.A.P. 9th Cir. 1986).  The 2002 JOA was clearly an executory contract, because performance obligations remained due from both parties, such that the failure of either party to meet those performance obligations would constitute a breach.  Thus, despite the fact that state law may designate the AMI provision as a covenant running with the land, the entire contract which contained the AMI provision was an executory contract which was subject to assumption or rejection pursuant to the provisions of the Bankruptcy Code.

Finally, Trail Mountain raises due process concerns, alleging that it was not

---

upon PYR.  Thus, the motion for partial summary judgment filed by Samson, which must properly be denied.

allowed a proper opportunity to object to transactions which essentially terminated its AMI rights under the 2002 JOA. However, that contention is erroneous. Trail Mountain contends that, because it was not "aware" that the Cotton Creek acreage had been previously withheld from the Nome Field transfer to Samson in 2003, it was thereby denied a meaningful opportunity to adequately scrutinize the PYR sale documents in 2004, including the contract assumption motion. Trail Mountain further contends that, if it had been aware that the previously-reserved portion of the Nome Field was being transferred to PYR, it would have objected to the assumption motion and insisted that the 2002 JOA be included as a contract to be assumed by Venus and assigned to PYR.

The salient fact remains that no party has suggested that the legal descriptions of the leases to be transferred to Samson in 2003 did not properly identify the actual leaseholds that Venus and Samson had agreed to transfer — i.e., all of the Nome Field except the Cotton Creek acreage. Rather Trail Mountain suggests that certain behavior *of Venus* led it to believe that the entirety of the Nome Field was being transferred to Samson.[21] Whatever understanding Trail Mountain or its counsel may have had, and even assuming for the sake of argument, that some unspecified behavior by Venus may have contributed to that understanding, the fact remains that: (1) Trail Mountain received notice of the accurate Samson sale documents in 2003; and (2) it had an adequate opportunity to determine whether or not it wished to prosecute an objection to the Samson

---

[21] An important point, and one expressly avoided by Trail Mountain's arguments, is that alleged wrongdoing by Venus is not a proper ground to expand the liability PYR assumed under the PYR PSA.

**-18-**

sale.  That determination was solely the responsibility of Trail Mountain.  It exercised that

responsibility by electing to forego any objection to the Samson sale and, upon resolution

of the objections which were filed by Range and the Unsecured Creditors' Committee, the

sale to Samson free and clear of liens was approved.

Trail Mountain, while perhaps operating under its own misperceptions regarding

the scope of the Venus sale to PYR, had yet an additional opportunity to cure any such

misperceptions.  It received proper notice of the PYR PSA and the related motion for

assumption and assignment of the designated contractual documents.  Trail Mountain

participated fully in the PYR sale process, and even filed an objection inquiring whether

PYR was assuming certain other operating agreements.  Eventually, Trail Mountain

approved the order authorizing the sale to PYR free and clear of all liens and

encumbrances and approving the list of executory contracts/leases which PYR would

assume as a part of that transaction.  Trail Mountain's receipt of proper notice of the PYR

sale, along with its failure to object with respect to the Cotton Creek property, as well as

its full participation in the hearing, collectively constitute a forfeiture of any right it might

have possessed prior to the PYR sale hearing to object to the consequences of the PYR

sale[22] and certainly precludes any argument that it was denied due process of law

---

[22]  It should be noted that, though the terms are improperly interchanged on occasion, forfeiture and waiver are distinct legal concepts.  While Trail Mountain perhaps did not waive its rights under the 2002 JOA (waiver being the "intentional relinquishment of a known right"), it certainly did forfeit them (forfeiture being the "failure to make the timely assertion of a right").  *See generally Kontrick v. Ryan*, 540 U.S. 443, 458, 124 S.Ct. 906, 917, 157 L.Ed.2d 867 (2004).

regarding PYR's acquisition of these properties free and clear of liens and free of any

obligation under any executory contract or lease not specifically assumed and assigned to

PYR in the process.

## Conclusion

Trail Mountain has posited multiple theories as to why PYR ought to be bound by

the 2002 JOA.  None of them withstand scrutiny.  The sale to PYR was effectuated

pursuant to the Bankruptcy Code provisions dealing with sales free and clear of liens,

claims and encumbrances.  PYR did not assume liability under all of the contractual

agreements to which Venus was bound and state law concepts of covenants running with

the land do not preclude that result.  Finally, Trail Mountain fully participated in both the

2003 sale to Samson and the 2004 sale to PYR which led to the alteration of its

contractual rights and it has forfeited any right to bring a subsequent complaint against

PYR about the ramifications of those sales transactions.[23]  Therefore, the Court concludes

that PYR is not bound by the provisions of the 2002 JOA and that PYR's motion for

summary judgment should be granted. The motions for partial summary judgment filed by

Trail Mountain and Samson, respectively, shall be denied.  Further, since PYR is not

---

[23] Thus, the circumstances surrounding the sale to PYR are distinctively different from those surrounding the uncontested expedited sale of Venus' interests in the Constitution Field to Samson in January 2003.  It must be noted that the contested order arising from the expedited sale of the Constitution Field which protected the cure claims of TMI and Range based upon an implied assumption of their executory contracts derived from the entirety of those circumstances, never became a final order due to pending reconsideration requests which were ultimately resolved by settlement.

bound by the 2002 JOA as a matter of law, the remaining claims asserted in Trail

Mountain's complaint — i.e, its claims for reformation, specific performance, and for

damages arising from the alleged breach of the 2002 JOA contract by PYR, as well as the

accompanying request for an award of attorney's fees — shall also be denied and PYR's

Motion for Interpretation and Enforcement of §363 Sale Order shall be granted.

Appropriate orders regarding all motions and a judgment in the adversary proceeding

shall be entered in favor of PYR in a manner consistent with this opinion.


Signed on 04/17/2007


THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE